## GIBONEY ET AL. *v.* EMPIRE STORAGE & ICE CO.

No. 182.   Argued January 4–5, 1949.—Decided April 4, 1949.

*Clif Langsdale* argued the cause and filed a brief for appellants. *Clyde Taylor* was also of counsel.

*Richard K. Phelps* submitted on brief for appellee.

*Arthur J. Goldberg, Frank Donner* and *Thomas E. Harris* filed a memorandum for the Congress of Industrial Organizations and its affiliated organizations, as *amici curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case here on appeal under 28 U. S. C. § 1257 raises questions concerning the constitutional power of a state to apply its anti-trade-restraint law [1] to labor union activities, and to enjoin union members from peaceful picketing carried on as an essential and inseparable part of a course of conduct which is in violation of the state

[1] *"Combinations in restraint of trade declared a conspiracy*

"Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this state, or any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in this article." Mo. Rev. Stat. Ann. § 8301 (1939).

And § 8305 provides that anyone violating § 8301 "shall be adjudged guilty of a felony, and upon conviction thereof shall be punished by imprisonment in the penitentiary not exceeding five years, or by imprisonment in the county jail not exceeding one year, or by a fine of not less than five hundred dollars nor more than five thousand dollars, or by both such fine and imprisonment." Mo. Rev. Stat. Ann. § 8305 (1939).

law.   The picketing occurred in Kansas City, Missouri. The injunction was issued by a Missouri state court.

The appellants are members and officers of the Ice and Coal Drivers and Handlers Local Union No. 953, affiliated with the American Federation of Labor.   Its membership includes about 160 of 200 retail ice peddlers who drive their own trucks in selling ice from door to door in Kansas City.   The union began efforts to induce all the nonunion peddlers to join.   One objective of the organizational drive was to better wage and working conditions of peddlers and their helpers.   Most of the nonunion peddlers refused to join the union.   To break down their resistance the union adopted a plan which was designed to make it impossible for nonunion peddlers to buy ice to supply their retail customers in Kansas City.   Pursuant to the plan the union set about to obtain from all Kansas City wholesale ice distributors agreements that they would not sell ice to nonunion peddlers.   Agreements were obtained from all distributors except the appellee, Empire Storage and Ice Company.   Empire refused to agree.   The union thereupon informed Empire that it would use other means at its disposal to force Empire to come around to the union view.   Empire still refused to agree.   Its place of business was promptly picketed by union members although the only complaint registered against Empire, as indicated by placards carried by the pickets, was its continued sale of ice to nonunion peddlers.

Thus the avowed immediate purpose of the picketing was to compel Empire to agree to stop selling ice to nonunion peddlers.   Missouri statutes, set out in note 1, make such an agreement a crime punishable by a fine of not more than $5,000 and by imprisonment in the penitentiary for not more than five years.   Furthermore, under § 8308 of the Missouri Revised Statutes Ann.

(1939), had Empire made the agreement, the ice peddlers could have brought actions for triple damages for any injuries they sustained as a result of the agreement.

About 85% of the truck drivers working for Empire's customers were members of labor unions. These union truck drivers refused to deliver goods to or from Empire's place of business. Had any one of them crossed the picket line he would have been subject to fine or suspension by the union of which he was a member.

Because of the foregoing facts shown either by admissions, by undisputed evidence, or by unchallenged findings, the picketing had an instantaneous adverse effect on Empire's business. It was reduced 85%. In this dilemma, Empire was faced with three alternatives: It could continue to sell ice to nonunion peddlers, in which event it would be compelled to wage a fight for survival against overwhelming odds; it could stop selling ice to nonunion peddlers thereby relieving itself from further conflict with the union, in which event it would be subject to prosecution for crime and suits for triple damages; it could invoke the protection of the law. The last alternative was adopted.

Empire's complaint charged that the concerted efforts of union members to restrain Empire from selling to nonunion members was a violation of the anti-trade-restraint statute and that an agreement by Empire to refuse to make such sales would violate the same statute. It prayed for an injunction against the picketing. In answering, appellants asserted a constitutional right to picket Empire's premises in order to force it to discontinue sale of ice to nonunion peddlers. They contended that their right to do so was "guaranteed by the First and Fourteenth Amendments" because there was "a labor dispute existing" between appellants and appellee, and because the picketers publicized only the truthful infor-

mation that appellee was "selling ice to peddlers who are not members of the said defendants' union."

The trial court heard evidence, made findings and issued an injunction restraining the appellants from "placing pickets or picketing around or about the buildings" of Empire.

The State Supreme Court affirmed. 357 Mo. 671, 210 S. W. 2d 55. It agreed with the findings of the trial court that the conduct of appellants was pursuant to a local transportation combination used to compel Empire to stop selling ice to nonunion peddlers and that the purpose of the picketing was to force Empire to become a party to such combination. It held that such activities were unlawful because in violation of § 8301 of the Missouri statutes and further held that the injunction to prevent picketing for such unlawful purpose did not contravene the appellants' right of free speech.

In this Court appellants do not raise problems similar to those discussed in *Near* v. *Minnesota,* 283 U. S. 697, relating to censorship prior to publication as distinguished from sanctions to be imposed after publication, nor are their objections to the form, language, or scope of the injunction. See *Milk Wagon Drivers* v. *Meadowmoor Dairies,* 312 U. S. 287, 297–298, also dissenting opinion, 299–303. Attacking the Missouri statute as construed and applied, appellants broadly challenge the power of the state to issue any injunction against their conduct since, they assert, the primary objective of their combination and picketing was to improve wage and working conditions. On this premise they argue that their right to combine, to picket, and to publish must be determined by focusing attention exclusively upon their lawful purpose to improve labor conditions, and that their violation of the state anti-trade-restraint laws must be dismissed as merely incidental to this lawful purpose.

*First.* That states have constitutional power to prohibit competing dealers and their aiders and abettors from combining to restrain freedom of trade is beyond question. *Watson* v. *Buck,* 313 U. S. 387, 403–404. In speaking of the Missouri statutory antecedent of the statute here challenged, this Court said: "The purpose of such statutes is to secure competition and preclude combinations which tend to defeat it. . . . There is nothing in the Constitution of the United States which precludes a State from adopting and enforcing such policy. To so decide would be stepping backwards." *International Harvester Co.* v. *Missouri,* 234 U. S. 199, 209. Agreements and combinations not to sell to or buy goods from particular persons, or to dictate the terms under which transportation will be supplied, are well recognized trade restraint practices which both state and national legislation can and do prohibit. *Grenada Lbr. Co.* v. *Mississippi,* 217 U. S. 433, 440–441; *Eastern States Lbr. Assn.* v. *United States,* 234 U. S. 600, 612–614; *Fashion Guild* v. *Trade Comm'n,* 312 U. S. 457, 465; *United States* v. *Freight Assn.,* 166 U. S. 290, 324–325.

*Second.* It is contended that though the Missouri statute can be applied validly to combinations of businessmen who agree not to sell to certain persons, it cannot be applied constitutionally to combinations of union workers who agree in their self-interest to use their joint power to prevent sales to nonunion workers. This contention appears to be grounded on the guaranties of freedom of speech and press stemming from the Fourteenth and First Amendments. Aside from the element of disseminating information through peaceful picketers, later discussed, it is difficult to perceive how it could be thought that these constitutional guaranties afford labor union members a peculiar immunity from laws against trade restraint combinations, unless, as appellants contend, labor unions are

given special constitutional protection denied all other people.[2]

The objective of unions to improve wages and working conditions has sometimes commended itself to Congress and to state legislatures. To the extent that the states or Congress, for this or other reasons, have seen fit to exempt unions from antitrust laws, this Court has sustained legislative power to grant the exemptions. *International Harvester Co.* v. *Missouri,* 234 U. S. 199; *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 810–811; *United States* v. *Hutcheson,* 312 U. S. 219, 232–234; and see *Tigner* v. *Texas,* 310 U. S. 141. On the other hand, where statutes have not granted exemptions, we have declared that violations of antitrust laws could not be defended on the ground that a particular accused combination would not injure but would actually help manufacturers, laborers, retailers, consumers, or the public in general. *Fashion Guild* v. *Trade Comm'n,* 312 U. S. 457, 467–468. More than thirty years ago this Court said (*International Harvester Co.* v. *Missouri, supra,* at 209): "It is too late in the day to assert against statutes which forbid combinations of competing companies that a particular combination was induced by good intentions . . . ." See also *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 220–221; *Mandeville Farms* v. *Sugar Co.,* 334 U. S. 219, 242–243.

---

[2] Appellants say, after quoting from a concurring opinion in *United States* v. *Hutcheson,* 312 U. S. 219, 243, "We believe, therefore, that it is perfectly clear that a state may not apply either statutory or common law policies concerning restraint of trade to illegalize combinations among workingmen for the purpose of eliminating wage competition throughout a trade or industry." And petitioners further argue that a state may not "make it unlawful for an employer to acquiesce in union demands that he refrain from supplying goods to nonunion peddlers . . . ."

The foregoing holdings rest on the premise that legislative power to regulate trade and commerce includes the power to determine what groups, if any, shall be regulated, and whether certain regulations will help or injure businessmen, workers, and the public in general.[3]   In making this determination Missouri has decided to apply its law without exception to *all* persons who combine to restrain freedom of trade.   We are without constitutional authority to modify or upset Missouri's determination that it is in the public interest to make combinations of workers subject to laws designed to keep the channels of trade wholly free and open.   To exalt all labor union conduct in restraint of trade above all state control would greatly reduce the traditional powers of states over their domestic economy and might conceivably make it impossible for them to enforce their anti-trade-restraint laws.   See *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 810.   More than that, if for the reasons here contended states cannot subject union members to such anti-trade-restraint laws as Missouri's, neither can Congress.   The Constitution has not so greatly impaired the states' or nation's power to govern.

*Third.* It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgment of free speech because the

---

[3] In the *International Harvester Co.* case, 234 U. S. 199, the then Missouri statute was construed as inapplicable to combinations of purchasers and laborers.   For this reason the statute was challenged as denying equal protection of the laws.   Replying to the challenge, this Court said at p. 210: "Whether it would have been better policy to have made such comprehensive classification it is not our province to decide.   In other words, whether a combination of wage earners or purchasers of commodities called for repression by law under the conditions in the State was for the legislature of the State to determine."

picketers were attempting peacefully to publicize truthful facts about a labor dispute. See *Thornhill* v. *Alabama,* 310 U. S. 88, 102, and *Allen Bradley Co.* v. *Union,* 325 U. S. 797, 807, note 12. But the record here does not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings, and the argument of the appellants, the sole immediate object of the publicizing adjacent to the premises of Empire, as well as the other activities of the appellants and their allies, was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities—their powerful transportation combination, their patrolling, their formation of a picket line warning union men not to cross at peril of their union membership, their publicizing—constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. In this situation, the injunction did no more than enjoin an offense against Missouri law, a felony.

It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now. Nothing that was said or decided in any of the cases relied on by appellants calls for a different holding.

Neither *Thornhill* v. *Alabama, supra,* nor *Carlson* v. *California,* 310 U. S. 106, both decided the same day, supports the contention that conduct otherwise unlawful is always immune from state regulation because an integral part of that conduct is carried on by display of placards by peaceful picketers. In both these cases this Court struck down statutes which banned all dissemination of information by people adjacent to certain premises, pointing out that the statutes were so broad that they could not only be utilized to punish conduct plainly

illegal but could also be applied to ban all truthful publications of the facts of a labor controversy. But in the *Thornhill* opinion, at pp. 103–104, the Court was careful to point out that it was within the province of states "to set the limits of permissible contest open to industrial combatants." See *Lincoln Labor Union* v. *Northwestern Iron & Metal Co.,* 335 U. S. 525, 536; *Allen-Bradley Local* v. *Board,* 315 U. S. 740, 748–751. Further emphasizing the power of a state "to set the limits of permissible contest open to industrial combatants" the Court cited with approval the opinion of Mr. Justice Brandeis in *Duplex Printing Co.* v. *Deering,* 254 U. S. 443, at 488. On that page the opinion stated:

> "The conditions developed in industry may be such that those engaged in it cannot continue their struggle without danger to the community. But it is not for judges to determine whether such conditions exist, nor is it their function to set the limits of permissible contest and to declare the duties which the new situation demands. This is the function of the legislature which, while limiting individual and group rights of aggression and defense, may substitute processes of justice for the more primitive method of trial by combat."

After emphasizing state power over industrial conflicts, the Court in the *Thornhill* opinion went on to say, at p. 104, that states may not "in dealing with the evils arising from industrial disputes . . . impair the effective exercise of the right to discuss freely industrial relations . . . ." This statement must be considered in its context. It was directed toward a sweeping state prohibition which this Court found to embrace "nearly every practicable, effective means whereby those interested— including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute."

That the general statement of the limitation of a state's power to impair free speech was not intended to apply to the fact situation presented here is further indicated by the cases cited with approval in note 21 of the *Thornhill* opinion.[4]

Appellants also rely on *Carpenters Union* v. *Ritter's Cafe,* 315 U. S. 722, and *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, decided the same day. Neither lends support to the contention that peaceful picketing is beyond legislative control. The Court's opinion in the *Ritter* case approvingly quoted a part of the *Thornhill* opinion which recognized broad state powers over industrial conflicts. In the *Wohl* case, the Court's opinion at p. 775 found no "violence, force or coercion, or conduct otherwise unlawful or oppressive" and said that

---

[4] *Eastern States Lumber Dealers* v. *United States,* 234 U. S. 600, was cited in note 21. In that case the lumber association was a combination of retail lumber dealers found by the court to have conspired to prevent wholesale dealers from selling directly to consumers of lumber. The sole basis for the injunction was the distribution and dissemination of truthful information by the association to its members in an official report. This Court sustained the decree which broadly enjoined the distribution of this truthful information.

The cases cited in note 21 of the *Thornhill* opinion include the following, strongly emphasizing states' powers to regulate their internal industrial and economic affairs and rejecting contentions that challenged regulations violated the Federal Constitution. *Senn* v. *Tile Layers Union,* 301 U. S. 468; *West Coast Hotel Co.* v. *Parrish,* 300 U. S. 379; *Nebbia* v. *New York,* 291 U. S. 502; *Dorchy* v. *Kansas,* 272 U. S. 306; *Aikens* v. *Wisconsin,* 195 U. S. 194; *Holden* v. *Hardy,* 169 U. S. 366. Another case cited in note 21 of the *Thornhill* opinion was *Ethyl Gasoline Corp.* v. *United States,* 309 U. S. 436. It also involved a violation of the federal antitrust laws, and once again this Court sustained the power of the Government to enjoin trade practices deemed in violation of those laws. The only other case cited in note 21, *Labor Board* v. *Newport News Co.,* 308 U. S. 241, sustained an order against an employer which restrained it from using its influence over employees to interfere with their activities.

"A state is not required to tolerate in all places . . . even peaceful picketing by an individual." A concurring opinion in the *Wohl* case, at pp. 776–777, pointed out that picketing may include conduct other than speech, conduct which can be made the subject of restrictive legislation. No opinions relied on by petitioners assert a constitutional right in picketers to take advantage of speech or press to violate valid laws designed to protect important interests of society.[5]

We think the circumstances here and the reasons advanced by the Missouri courts justify restraint of the picketing which was done in violation of Missouri's valid law for the sole immediate purpose of continuing a violation of law. In holding this, we are mindful of the essential importance to our society of a vigilant protection of freedom of speech and press. *Bridges* v. *California,* 314 U. S. 252, 263. States cannot consistently

---

[5] Both parties here rely on the *Ritter* case. Empire contends that this Court affirmed the action of the Texas courts on the basis of the state's antitrust law. Appellants argue that this Court upheld the Texas injunction on the ground that the business picketed did not bear a sufficiently close relation to the labor dispute to justify picketing at that place. Since the Court relied on this ground, appellants contend that the Court impliedly rejected the contention that the injunction was justified because of an alleged violation of the antitrust laws. This Court's opinion in the *Ritter* case, as well as the dissents, did emphasize questions other than the antitrust act contentions. The Court of Civil Appeals of Texas had not mentioned the Texas antitrust laws in its first or second opinion in the *Ritter* case. 138 S. W. 2d 223, 149 S. W. 2d 694. A third opinion, denying rehearing, did make reference for the first time to the state's antitrust laws, but did not definitely point out in what way the picketers' conduct violated any specific provision of these laws. 149 S. W. 2d 694, 699. Under these circumstances nothing that was said in the *Ritter* opinion stands for the principle that speech and writings, utilized as a part of conduct engaged in only to break a valid anti-trade-restraint law, render that course of conduct immune from state control.

with our Constitution abridge those freedoms to obviate slight inconveniences or annoyances. *Schneider* v. *State,* 308 U. S. 147, 162. But placards used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control. *Virginia Electric Co.* v. *Board,* 319 U. S. 533, 539; *Thomas* v. *Collins,* 323 U. S. 516, 536, 537, 538, 539–540. Nor can we say that the publication here should not have been restrained because of the possibility of separating the picketing conduct into illegal and legal parts. *Thomas* v. *Collins, supra,* at 547. For the placards were to effectuate the purposes of an unlawful combination, and their sole, unlawful immediate objective was to induce Empire to violate the Missouri law by acquiescing in unlawful demands to agree not to sell ice to nonunion peddlers. It is true that the agreements and course of conduct here were as in most instances brought about through speaking or writing. But it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed. See *e. g., Fox* v. *Washington,* 236 U. S. 273, 277; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. Such an expansive interpretation of the constitutional guaranties of speech and press would make it practically impossible ever to enforce laws against agreements in restraint of trade as well as many other agreements and conspiracies deemed injurious to society.

The interest of Missouri in enforcement of its antitrust laws cannot be classified as an effort to outlaw only a slight public inconvenience or annoyance. The Missouri policy against restraints of trade is of long standing and is in most respects the same as that which the Federal Government has followed for more than half a century. It is clearly drawn in an attempt to afford all persons an equal oppor-

tunity to buy goods. There was clear danger, imminent and immediate, that unless restrained, appellants would succeed in making that policy a dead letter insofar as purchases by nonunion men were concerned. Appellants' power with that of their allies was irresistible. And it is clear that appellants were doing more than exercising a right of free speech or press. *Bakery Drivers Local* v. *Wohl,* 315 U. S. 769, 776–777. They were exercising their economic power together with that of their allies to compel Empire to abide by union rather than by state regulation of trade.[6]

What we have said emphasizes that this is not a case in which it can be assumed that injury from appellants' conduct would be limited to this single appellee. *Thornhill* v. *Alabama,* 310 U. S. 88, 104–105. Missouri, acting within its power, has decided that such restraints of trade as petitioners sought are against the interests

---

[6] "Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation." *Bakery Drivers Local* v. *Wohl, supra,* at 776–777.

The opinion in *Thomas* v. *Collins,* 323 U. S. 516, 537–538 stated: ". . . When to this persuasion other things are added which bring about coercion, or give it that character, the limit of the right has been passed. . . . But short of that limit the employer's freedom cannot be impaired. The Constitution protects no less the employees' converse right. Of course espousal of the cause of labor is entitled to no higher constitutional protection than the espousal of any other lawful cause. It is entitled to the same protection."

A concurring opinion in *Thomas* v. *Collins,* at 543–544, stated this: "But once he uses the economic power which he has over other men and their jobs to influence their action, he is doing more than exercising the freedom of speech protected by the First Amendment. That is true whether he be an employer or an employee. But as long as he does no more than speak he has the same unfettered right, no matter what side of an issue he espouses."

of the whole public. This decision is in accord with the general ideas underlying all anti-trade-restraint laws. It is not for us to overrule this clearly adopted state policy.

While the State of Missouri is not a party in this case, it is plain that the basic issue is whether Missouri or a labor union has paramount constitutional power to regulate and govern the manner in which certain trade practices shall be carried on in Kansas City, Missouri. Missouri has by statute regulated trade one way. The appellant union members have adopted a program to regulate it another way. The state has provided for enforcement of its statutory rule by imposing civil and criminal sanctions. The union has provided for enforcement of its rule by sanctions against union members who cross picket lines. See *Associated Press* v. *United States,* 326 U. S. 1, 19; *Fashion Guild* v. *Trade Comm'n, supra,* at 465; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 211, 242. We hold that the state's power to govern in this field is paramount, and that nothing in the constitutional guaranties of speech or press compels a state to apply or not to apply its anti-trade-restraint law to groups of workers, businessmen or others. Of course this Court does not pass on the wisdom of the Missouri statute. We hold only that as here construed and applied it does not violate the Federal Constitution.

*Affirmed.*