**Jeffrey SCHWARTZ, a minor by his mother Zorya Schwartz, Plaintiff,**

**v.**

**Louis SCHUKER, individually and as Principal of Jamaica High School and Max Rubinstein, individually and as District Superintendent of District 29, New York City Board of Education, Defendants.**

No. 69–C–134.

United States District Court
E. D. New York.

March 27, 1969.

Paul G. Chevigny, New York City, New York Civil Liberties Union, for plaintiff; Roy Lucas, New York City, of counsel.

J. Lee Rankin, Corporation Counsel, for defendants; John J. Loflin, Jr., New York City, Charles D. Maurer, Jamaica, of counsel.

Vladeck, Elias, Frankle, Vladeck & Lewis, New York City, for defendant Louis Schuker; Bernard Yaker, New York City, of counsel.

BARTELS, District Judge.

Plaintiff, Jeffrey Schwartz, a minor (Jeffrey), a student at the Jamaica High School, claims he was suspended for exercising his First Amendment right of freedom of speech in distributing off school grounds near the property of the high school, Issue No. 5 of a newspaper entitled "High School Free Press", criticizing the principal, Louis Schuker, and other members of the administration. Accordingly, he brings this action through his mother, Zorya Schwartz, under 28 U.S.C.A. § 2201 *et seq.* and 42 U.S.C.A. § 1983, against Schuker and the District Superintendent of the school district, for a declaratory judgment and an injunction to prevent further deprivation of Jeffrey's rights, and to mandate his reinstatement as a student at the Jamaica High School. To accomplish this purpose, Jeffrey moves for a preliminary injunction under Rule 65, Fed.Rules Civ. Proc., 28 U.S.C.A., and for immediate action to enjoin the suspension and any further disciplinary proceedings against him in order to protect him from further injury to his academic career.

Jeffrey is a senior at the high school and was found on April 2, 1968, distributing Peace Strike materials on school grounds during the school day, calling for a student strike. He was not punished but was advised by the Dean that students were not permitted to distribute outside literature on school grounds without specific permission and that a violation of this resolution would constitute a serious breach of school discipline. Subsequently, on December 9, 1968, at a time when there were city-wide riots by students protesting the lengthened school day, Jeffrey was interviewed by an administrative assistant concerning materials to be distributed in the school calling for a student strike during school hours, and admitted that he was part of the student strike movement. No charge was made at that time that he was distributing any material but he admitted in his affidavit that at the interview he refused to give the administrative assist-

ant the names of the members of the Student Union. The next day, December 10, 1968, Jeffrey's parents were interviewed upon the subject of their son's association with student strikes, at which time, according to Schuker's affidavit, there were five hundred pupils from other schools at the Jamaica High School attempting to "seduce pupils out of Jamaica". As appears from Schuker's affidavit, both parents asserted that their son had a right to carry on student strikes and to attack the "Establishment" at all times and in any manner that Jeffrey deemed proper, although Jeffrey in his affidavit denied that they said that he had a right to attack the "Establishment".

On January 20, 1969, Principal Schuker conferred with Jeffrey about the proposed Issue 5 of the High School Free Press (which is independently published off school property for circulation among many high schools) and advised him that under no conditions would he be permitted to distribute this material in school or on school grounds. Schuker based his reason upon the fact that he had read the previous issue, number 4, which was attached to his affidavit and which the court can verify, after reading, contained four-letter words, filthy references, abusive and disgusting language and nihilistic propaganda. Nevertheless, Jeffrey, on January 24, 1969, appeared on the school grounds carrying thirty-two copies of Issue 5 of the High School Free Press. This issue, among other things, criticized Principal Schuker, referring to him as "King Louis", "a big liar", and a person having "racist views and attitudes". Other pupils were apprehended distributing copies of this newspaper on school grounds, and four admitted violating school regulations and surrendered this material. Jeffrey was not charged with distribution but upon demand refused to surrender to the Dean the material unless taken by force. At the same time he advised a second-year student to disobey the Dean and to likewise refuse to surrender his copies.

As a result of this action, Jeffrey was excluded from classes "for contumelious behavior at the end of the school day", as stated in a letter to his parents requesting an interview which was held on January 27, 1969. Upon this occasion the parents were informed in Jeffrey's presence that Jeffrey was formally suspended and that a suspense hearing would be set up in the future. This notice was confirmed in writing by a letter to Jeffrey's parents on the same day. Nevertheless, on February 5, 1969, Jeffrey appeared in the classroom at the Jamaica High School and admitted that he was present in defiance of the superintendent's order by his mother's instructions. The suspense hearing was held, as a result of which the district superintendent recommended that Jeffrey be graduated on January 31, 1969 or, as an alternative, be transferred to either of two other high schools in the same district. This option was not exercised by Jeffrey or his parents and to this extent injury to Jeffrey's academic career was not demonstrated.

I

■■ Plaintiff complains that (1) he was never charged with or had a hearing upon any alleged violation of school regulations and (2) he was unconstitutionally punished for the exercise of his First Amendment rights. The first charge may be dismissed upon the ground that the administrative procedures applicable by statute to this offense were followed. What constitutes due process free from specifics of the Fifth and Sixth Amendments depends upon the facts in each particular case and the particular procedures followed. In this case the applicable provisions of the New York Education Law, McKinney's Consol.Laws c. 16 (Education Law) provide that the Commissioner of Education shall be the chief executive officer (§ 305(1)) with general supervision of all schools and institutions (§ 305(2)), and that a school principal shall be responsible for the administration, instruction and control of the teach-

ing and administrative staff of the school, with the obligation to carry out the requirements of the Board of Education according to its by-laws, rules and regulations (Board of Education By-Law § 89). The school authorities, including the superintendent of schools or district superintendent of schools, may suspend a pupil who is insubordinate or disorderly or who endangers the safety or morals of himself or other minors (§ 3214(6)). The student is required to be subordinate and orderly while attending school (§ 3210(1)). The charge against Jeffrey was insubordination and insolent behavior, for which he was suspended. Before the event, there were informal conferences with him and his parents, at which time he had ample opportunity to explain his position.

█ Section 310 of the Education Law provides for an appeal by an aggrieved student to the Commissioner of Education concerning any official act of the school authorities relating to any matter under the Education Law pertaining to the schools. Jeffrey and his parents did not choose to take advantage of this appellate procedure. This was not a criminal proceeding and there is no statutory or other legal necessity for a formal charge or hearing involving Jeffrey's suspension from school. The proceedings amply satisfied the applicable principles of due process and were so held in Madera v. Board of Education, 386 F.2d 778 (2d Cir. 1967), cert. denied, 390 U.S. 1028, 88 S.Ct. 1416, 20 L.Ed.2d 284 (1968), where Judge Moore, after a review of the cases, among other things, said (386 F.2d pp. 788–789):

> "Law and order in the classroom should be the responsibility of our respective educational systems. The Courts should not usurp this function and turn disciplinary problems, involving suspension, into criminal adversary proceedings—which they definitely are not. The rules, regulations, procedures and practices disclosed on this record evince a high regard for the best interest and welfare of the child.

The courts would do well to recognize this."

## II

A more serious charge is the alleged offense against freedom of speech mandated by the First Amendment. It has been repeatedly held that the provisions of the First Amendment apply to high school students as well as to others. See, Tinker v. Des Moines Independent School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, February 24, 1969; Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966); Jones v. State Board of Education Of and For the State of Tennessee, 407 F.2d 834 (6th Cir. 1969). The difficulty with plaintiff's contention is that it is far from clear from the affidavits submitted by both parties, that Jeffrey was suspended because of protected activity under the First Amendment rather than flagrant and defiant disobedience of the school authorities. While his action might have also included actual or threatened dissemination of the paper on or off school premises, his conduct went much further. When cautioned not to bring on school premises copies of the newspaper, he nevertheless did so; when asked to surrender the same, he refused and in addition attempted to influence another student to do likewise; when suspended from school and told not to report, he nevertheless appeared in school and admitted defiance of the superintendent's orders. While the latter event might have been *ex post facto*, it nevertheless confirmed a pattern of open and flagrant defiance of school discipline, aided and abetted by his parents' encouragement. There surely was another way if he and his parents so desired, to squarely present the issue of his right to disseminate off but next to school property, copies of the subterranean paper, High School Free Press. In referring to this possibility, the Court does not express an opinion that distribution of such an underground paper under those circumstances would or would not be immune from restraint

**242**

under the First Amendment. A special note should be taken that the activities of high school students do not always fall within the same category as the conduct of college students, the former being in a much more adolescent and immature stage of life and less able to screen fact from propaganda.

■ In our system of government, there is no right to suppress or censor speech or expressions even though they may be hateful or offensive to those in authority or opposed by the majority. Cox v. State of Louisiana, 379 U.S. 536, 551–552, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). It is likewise true that the freedom of speech and association protected by the First and Fourteenth Amendments are not "absolutes" and are subject to constitutional restrictions for the protection of the social interest in government, order and morality. Konigsberg v. State Bar of California, 366 U.S. 36, 50, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961), reh. denied, 368 U.S. 869, 82 S.Ct. 21, 7 L.Ed.2d 69 (1961); Beauharnais v. People, 343 U.S. 250, 256, 72 S.Ct. 725, 96 L.Ed. 919 (1952); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 501, 69 S.Ct. 684, 93 L.Ed. 834 (1949). While there is a certain aura of sacredness attached to the First Amendment, nevertheless these First Amendment rights must be balanced against the duty and obligation of the state to educate students in an orderly and decent manner to protect the rights not of a few but of all of the students in the school system. The line of reason must be drawn somewhere in this area of ever expanding permissibility. Gross disrespect and contempt for the officials of an educational institution may be justification not only for suspension but also for expulsion of a student. *Cf.*, Jones v. State Board of Education Of and For the State of Tennessee, *supra.*

In the context of the facts disclosed by the affidavits, the Court finds no basis for a preliminary injunction and the application is accordingly denied.

So ordered.